**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| WI-LAN INC., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 6:10-cv-521-LED |
| | § | Civil Action No. 6:13-cv-252-LED |
| v. | § | CASES CONSOLIDATED FOR |
| | § | TRIAL |
| ALCATEL-LUCENT USA INC.; *et al.*, | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |
| | § | |

## PLAINTIFF WI-LAN INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO INVALIDITY OR, ALTERNATIVELY, MOTION FOR NEW TRIAL ON INVALIDITY

**Table of Contents**

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARDS .................................................................................................2

      A.      Standard for Granting Judgment as a Matter of Law...............................................2

      B.      Standard for Granting a New Trial ..........................................................................2

      C.      Anticipation.............................................................................................................3

      D.      Obviousness ............................................................................................................4

III.    ARGUMENT .................................................................................................................5

      A.      Mr. Lanning's Testimony Regarding the Prior Art Combinations for
              Obviousness and the Motivation to Combine Was Conclusory and
              Insufficient as a Matter of Law...............................................................................5

      B.      Tiedemann Fails to Anticipate or Render the Claims Obvious Because It
              Does Not Disclose Allocating Time Slots to Data Items "Based on One or
              More Characteristics Associated With the Data Item" as Required by the
              Court's Construction of "TDM Techniques."........................................................10

      C.      The Court Should Grant a New Trial on Invalidity Because the
              Overwhelming Weight of the Evidence Showed That Characteristics of
              the User, Such as User or Device Identification, Cannot Satisfy the
              Requirement of "TDM Techniques" to Use "Characteristics Associated
              with the Data Item."...............................................................................................14

IV.     CONCLUSION............................................................................................................16

# Table of Authorities

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ................................................................. 4, 5, 7, 8

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   212 F.3d 1272 (Fed. Cir. 2000) ................................................................. 3

*Bettcher Indus., Inc. v. Buznl USA, Inc.*,
   661 F.3d 629 (Fed. Cir. 2011) ................................................................. 3

*Dawson v. Wal-Mart Stores, Inc.*,
   978 F.2d 205 (5th Cir. 1992) ................................................................. 2

*Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*,
   819 F.2d 1100 (Fed. Cir. 1987) ................................................................. 4

*In re Aoyama*,
   656 F.3d 1293 (Fed. Cir. 2011) ................................................................. 3

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ................................................................. 6, 7

*In re Oelrich*,
   666 F.2d 578 (C.C.P.A. 1981) ................................................................. 3

*In re Robertson*,
   169 F.3d 743 (Fed. Cir. 1999) ................................................................. 3

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ................................................................. 4, 6, 7

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. ——, 131 S. Ct. 2238 (2011) ................................................................. 3

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
   303 F.3d 1294 (Fed. Cir. 2002) ................................................................. 4

*Mirror Worlds, LLC v. Apple, Inc.*,
   784 F. Supp. 2d 703 (E.D. Tex. 2011),
   *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ................................................................. 2

*Oakley, Inc. v. Sunglass Hut Int'l*,
   316 F.3d 1331 (Fed. Cir. 2003) ................................................................. 3

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ................................................................. 3

*Procter & Gamble v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ........................................................................... 4, 7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) .............................................................................................. 2

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
   607 F.3d 784 (Fed. Cir. 2010) .............................................................................. 3

*Smith v. Transworld Drilling Co.*,
   773 F.2d 610 (5th Cir. 1985) ......................................................................... 2, 18

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
   295 F.3d 1292 (Fed. Cir. 2002) ............................................................................ 4

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ............................................................................ 3

**Statutes**

35 U.S.C. § 282 ............................................................................................................ 3

**Rules**

Fed. R. Civ. P. 50(a) .................................................................................................... 2

Fed. R. Civ. P. 50(b) ................................................................................................. 1, 2

Fed. R. Civ. P. 59 ......................................................................................................... 2

Fed. R. Civ. P. 59(a) .................................................................................................... 2

## I.      INTRODUCTION

The jury verdict finding claims 2, 5, and 9 of U.S. Patent No. 6,088,326 ("the '326 patent); claim 11 of U.S. Patent No. 6,222,819 ("the '819 patent"); and claims 2 and 5 of U.S. Patent No. 6,381,211 ("the '211 patent") (collectively, "the asserted claims") invalid cannot stand on the evidence introduced at trial.  No reasonable jury could have found that Defendants' expert on invalidity, Mr. Mark Lanning, presented evidence sufficient to meet Defendants' burden to show that the claims were anticipated and/or obvious by clear and convincing evidence.

First, Mr. Lanning's conclusory testimony on obviousness engages in improper hindsight bias, lacks evidentiary support, and ignores the differences between the references, such that Defendants failed to satisfy their burden to explain why a person of ordinary skill would have combined elements from the prior art in the same way as the asserted claims.  Second, as to anticipation of claims 2 and 5 of the '326 patent and claims 2 and 5 of the '211 patent, Mr. Lanning presented just a single prior art reference: an article titled "CDMA for Cellular and PCS" by Edward G. Tiedemann, Jr. published in 1994 ("Tiedemann") (*see* Trial Exhibit DX-124, attached as Exhibit A).   However, Tiedemann fails to disclose at least the "TDM techniques" required by each of these four claims.  Thus, no reasonable jury could have found the asserted claims anticipated and/or obvious in light of the evidence presented at trial.  In addition, the jury's verdict of invalidity was against the strong weight of the evidence, because the evidence at trial overwhelmingly favored the conclusion that user or mobile identity, or other characteristics of the user, could not satisfy the Court's construction of "TDM techniques" requiring "characteristics associated with the data item."

Plaintiff Wi-LAN Inc. ("Wi-LAN") therefore respectfully renews its motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(b) that the asserted

claims of the '326, '819, and '211 patents are not invalid.  Alternatively, if the Court denies this renewed motion for JMOL, Wi-LAN respectfully requests a new trial on the issue of invalidity under Federal Rule of Civil Procedure 59.

## II.    LEGAL STANDARDS

### A.    Standard for Granting Judgment as a Matter of Law

Judgment as a matter of law must be granted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 710 (E.D. Tex. 2011) (quoting Fed. R. Civ. P. 50(a)), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012).  "[A] court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quotation marks omitted); *see also* Fed. R. Civ. P. 50(a) & (b).  In deciding a motion for judgment as a matter of law, the proper inquiry is whether sufficient evidence exists to support the non-movant's claim when the evidence is viewed most favorably to the non-movant. *Reeves*, 530 U.S. at 150.

### B.    Standard for Granting a New Trial

Under Federal Rule of Civil Procedure 59, following a jury trial, "[t]he [C]ourt may, on motion, grant a new trial on all or some of the issues—and to any party— . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (footnotes omitted).  A new trial is appropriate where "the court believes that

reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

### C.    Anticipation

A patent is presumed valid.  35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. ——, ——, 131 S. Ct. 2238, 2242 (2011).  "To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention."  *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010); *see also Microsoft*, 131 S. Ct. at 2242; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1321 (Fed. Cir. 2011).

"Determining whether claims are anticipated involves a two-step analysis."  *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011).  The first step is construction of the claims of the patent at issue, which is a question of law.  *Id.*  "The second step in the analysis requires a comparison of the properly construed claim to the prior art . . . ."  *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004) (citing *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003)).

"[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  If a prior art reference does not expressly set forth a particular claim element, the reference may still anticipate if the element is inherent in the prior art.  *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999).  The claim element must necessarily be present in the prior art.  *Id.*  "Inherency, however, may not be established by probabilities or possibilities.  The mere fact that a certain thing may result from a given set of circumstances is not sufficient."  *Bettcher Indus., Inc. v.*

*Buzzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011) (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981)); *see also Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1297 (Fed. Cir. 2002) ("Inherency does not embrace probabilities or possibilities.").   Thus, if prior art potentially has all claim elements, but does not necessarily have all claim elements, the prior art does not anticipate the patent claim.

If an independent claim is not anticipated, any claims that depend upon that claim cannot be anticipated.  *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1299 (Fed. Cir. 2002); *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987).

### D.    Obviousness

"[A] patent composed of several elements is not proved obvious by merely demonstrating that each of its elements was, independently, known in the prior art."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).  "To invalidate a patent claim based on obviousness, a challenger must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (quoting *Procter & Gamble v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)).  "[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does . . . because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR*, 550 U.S. at 418–19.  As such, this analysis "should be explicit."  *Id.* at 418.  An expert opining on obviousness therefore must "explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*."

*ActiveVideo Networks*, 694 F.3d at 1328 (emphasis in original).  Thus, "conclusory" testimony or assertions by an expert are inadequate as a matter of law to support a jury finding of obviousness, as they may be "fraught with hindsight bias."  *See id.* at 1327.

## III.   ARGUMENT

### A.   Mr. Lanning's Testimony Regarding the Prior Art Combinations for Obviousness and the Motivation to Combine Was Conclusory and Insufficient as a Matter of Law.

Defendants' invalidity expert, Mr. Lanning, failed to engage in a proper obviousness analysis.  At trial, Mr. Lanning testified that there were two combinations of prior art that would have rendered the asserted claims obvious: Tiedemann combined with U.S. Patent No. 6,018,528 ("Gitlin") (*see* Trial Exhibit DX-148, attached as Exhibit B), and Gitlin combined with PCT international application publication no. WO 95/03652 ("Gilhousen") (*see* Trial Exhibit DX-150, attached as Exhibit C).  However, Mr. Lanning's testimony as to why a person of ordinary skill would have combined these references was entirely conclusory and factually unsupported.  Further, Mr. Lanning failed to explain why a person of ordinary skill in the art would have combined elements from these references in the way that the asserted claims do.  Therefore, as a matter of law, the evidence was insufficient for a reasonable jury to support a determination of obviousness.  *See ActiveVideo Networks*, 694 F.3d at 1327–28.

Mr. Lanning's obviousness analysis was entirely conclusory and clearly reflects hindsight bias.  For example, Defense counsel asked Mr. Lanning: "Why would you combine Gitlin and Tiedemann?"  Trial Transcript 68:2–3 (July 12, 2013 Morning Session) (cited portions attached as Exhibit E).  His response:

```
4       A. Because Gitlin doesn't have the overlay codes.
5  So, essentially, for at least the reason -- there's two
6  different reasons; but the main reason is that Gitlin
7  doesn't describe overlay codes. But as I showed you
8  earlier, Tiedemann does.
```

```
9        So in combining Gitlin with Tiedemann, Gitlin
10 gives us the CDMA plus TDM; Tiedemann gives us the
11 overlay codes.
12        Additionally, Tiedemann also gives us the
13 Walsh codes, if we need to show for the orthogonal codes
14 or CDMA. I have it in two places. Both Gitlin and
15 Tiedemann gives it -- gives us the orthogonal codes.
```

*Id.* at 68:4–15.  Mr. Lanning's explanation as to why one would combine Tiedemann with Gitlin thus incredibly reduces to the simple fact that he believes one reference has a claim element that the other lacks.  But "a patent composed of several elements is not proved obvious by merely demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 550 U.S. at 418.

Regarding a motivation to combine references, Mr. Lanning later also testified vaguely and in a conclusory fashion:

```
2        Q. Okay. And why would it have been obvious in
3 your mind to combine Gitlin and Tiedemann?
4        A. Because both of these patents are in regard to
5 cellular systems, specifically, CDMA wireless systems.
6        And Gitlin was from Bell Labs, AT&T Bell Labs.
7 Tiedemann was from Qualcomm. And as you've heard, in
8 the early 1990s, they were working together on CDMA
9 solutions.
10        So there's multiple reasons why one of
11 ordinary skill in the art would combine Gitlin with
12 Tiedemann.
```

Ex. E, Trial Transcript 70:2–12  (July 12, 2013 Morning Session).  However, neither the fact that both Tiedemann and Gitlin relate to "cellular systems" and "CDMA wireless systems," nor the fact that the two companies may have worked together, explains why a person of ordinary skill in the art would have been motivated to combine these two distinct references to solve the problem confronting the inventors.  At best, Mr. Lanning's testimony shows that Tiedemann and Gitlin are analogous art, but this is different than explaining a motivation to combine.  *See, e.g.*, *In re Kahn*, 441 F.3d 977, 986–88 (Fed. Cir. 2006).

6

The Supreme Court stated in *KSR* that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does . . . because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  550 U.S. at 418–19.  Indeed, the Court made clear that the obviousness analysis "should be explicit."  *Id.* at 418 (citing *Kahn*, 441 F.3d at 988 ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")).

The law thus requires that "a challenger must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *ActiveVideo Networks*, 694 F.3d at 1327 (quoting *Procter & Gamble*, 566 F.3d at 994).  Mr. Lanning's testimony, on the other hand, "is generic and bears no relation to any specific combination of prior art elements.  It also fails to explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*."  *See id.* at 1328 (emphasis in original).

Indeed, Mr. Lanning completely ignores the differences between Tiedemann and Gitlin, and suggests that the references could have been combined without considering how those differences would relate to the combination or the elements as arranged in the claims.  For example, in asserting that "Gitlin gives us the CDMA plus TDM; Tiedemann gives us the overlay codes" (Ex. E, Trial Transcript 68:9–11 (July 12, 2013 Morning Session)), Mr. Lanning suggests that Tiedemann's use of overlay codes on traffic channels (*see id.* at 63:17–19

(explaining that Tiedemann's traffic channels used overlay codes)) could have been combined with Gitlin.  But as Mr. Lanning testified earlier, Gitlin already discloses traffic channels, and those are the channels that Mr. Lanning alleges use "TDM techniques."  *See id.* at 66:23–67:22. Thus, Mr. Lanning's testimony fails to explain how or why a person of ordinary skill in the art would have combined the different types of traffic channels along with other elements from Tiedemann and Gitlin "in the way the claimed invention does."  *ActiveVideo Networks*, 694 F.3d at 1328.

Mr. Lanning's testimony to his combination of Gitlin and Gilhousen is, if anything, even thinner.  As with the combination of Tiedemann and Gitlin, Mr. Lanning appears to start his analysis with the fact that he believes one reference can fill a gap in another—a clear case of hindsight bias:

```
16      Q. If the jury were to conclude that a single
17 OVSF code was both an orthogonal code and an overlay
18 code, do you have an opinion as to whether Gitlin, in
19 combination with Gilhousen, would disclose all of the
20 elements of the asserted claims?
21      A. Yes. So let me go through it just briefly.
22      If you agree with Dr. Wells that the OVSF tree
23 meets the limitations of the claims, then you also have
24 to reconcile in your own mind who really defined it
25 first. And this was three years, at least three years
1 before the Airspan patents.
2      And then when you look at Dr. Gitlin from AT&T
3 Bell Labs, he has the CDMA plus the TDM here. And,
4 again, he's years before the Airspan patents.
5      And, again, you have the combination of AT&T
6 Bell Laboratories and of Qualcomm, when they were
7 working together. And both of these are wireless
8 cellular systems.
```

Ex. E, Trial Transcript 74:16–75:8 (July 12, 2013 Morning Session).  As with his first combination, Mr. Lanning notes that both Gitlin and Gilhousen relate to "wireless cellular systems" and that the two companies worked together.  But again, these conclusory statements

are insufficient to satisfy Defendants' burden as a matter of law, as they fail to explain how or why one would be motivated to combine the different pieces of the references in the way the claimed invention does.

Moreover, Mr. Lanning made no effort in his testimony to address the secondary considerations of nonobviousness introduced throughout trial.  For example, Dr. Jonathan Wells explained that the claimed inventions were adopted by the HSDPA standard and were directly tied to two of the major improvements offered by HSDPA.  *See* Trial Transcript 75:20–76:18 (July 8, 2013 Afternoon Session) (cited portions attached as Exhibit F).  Dr. Wells also testified about how those same improvements were praised by the industry, including by Defendants themselves.  *See id.* at 78:11–79:5.  Furthermore, Dr. Wells testified that the inventions of the patents in suit addressed the long felt need to provide an efficient and flexible system for wireless cellular communication due to the limited bandwidth problem.  *See id.* at 49:9–50:2, 64:10–20.  In addition, Mr. Andrew Parolin testified about the approximately 70 companies that have taken licenses to the patents in suit.  *See* Trial Transcript 84:14–85:25 (July 9, 2013 Afternoon Session) (cited portions attached as Exhibit G).  Mr. Lanning failed to address any of these objective indicia that the asserted claims are not obvious.

Thus, Mr. Lanning's conclusory testimony as to his proposed combinations of prior art and obviousness was insufficient as a matter of law, and as such, a reasonable jury would not have had a legally sufficient evidentiary basis to find that the asserted claims were invalid as obvious.

**B.**     **Tiedemann Fails to Anticipate or Render the Claims Obvious Because It Does Not Disclose Allocating Time Slots to Data Items "Based on One or More Characteristics Associated With the Data Item" as Required by the Court's Construction of "TDM Techniques."**

Defendants at trial presented Tiedemann as the sole anticipatory reference to claims 2 and 5 of the '326 patent and claims 2 and 5 of the '211 patent.  Therefore, the jury's finding that these four claims were anticipated (*see* Verdict Form, Dkt. No. 465 at 3) could only have been based on Tiedemann.  Mr. Lanning also expressed his opinion that Tiedemann as a single reference renders claim 9 of the '326 patent and claim 11 of the '819 patent obvious.  Ex. E, Trial Transcript 61:8–65:23 (July 12, 2013 Morning Session).  However, nothing in the four corners of Tiedemann discloses "TDM techniques" as construed by the Court.  In particular, nothing in Tiedemann discloses that time slots are allocated to data items "based on one or more characteristics associated with the data item."  Moreover, Mr. Lanning's testimony to the contrary is not supported by Tiedemann itself.  Therefore, based on the evidence introduced at trial concerning Tiedemann, no reasonable jury could have found that claims 2 and 5 of the '326 patent and claims 2 and 5 of the '211 patent are anticipated, and no reasonable jury could have found that claim 9 of the '326 patent and claim 11 of the '819 patent are obvious in light of Tiedemann.

Each of claims 2, 5, and 9 of the '326 patent, claim 11 of the '819 patent, and claims 2 and 5 of the '211 patent requires "TDM techniques."  The claims of the '326 and '819 patents contain this limitation within the text of the claims themselves, and the claims of the '211 patent contain this limitation through the term "TDM decoder," which the Court construed as "hardware and/or software for extracting a data item from a channel that has been encoded using TDM techniques."  Memorandum Opinion and Order, Dkt. No. 200 at 13.  The Court construed "TDM techniques" as "techniques for allocating an interval of time within a predetermined

frame period to a data item, based on one or more characteristics associated with the data item."

*Id.* at 11.   Therefore, in order for Tiedemann to invalidate the asserted claims as anticipated or obvious, it must disclose allocating time slots to data "based on one or more characteristics associated with the data item."[1] Tiedemann, however, fails in this regard.

During trial, Mr. Lanning focused on just the "paging channel" disclosed in Tiedemann to show "TDM techniques."   Noticeably absent from Mr. Lanning's testimony and the text of Tiedemann is any explanation of what criteria are used to allocate time slots to data within the paging channel mentioned in Tiedemann.   Mr. Lanning testified:

```
14      Q. And did you also find that TDM -- or that
15 Tiedemann described TDM techniques?
16      A. Yes, I did.
17      Q. And could you explain that?
18      A. Yes. And if this looks similar, this is very
19 similar to the language that I showed you for the
20 IS-95-A specification. And here at the top,
21 Mr. Tiedemann is describing the paging channel that I
22 talked about. It's divided into slots of 80
23 milliseconds' duration.
24      So this is the interval of time, are those
25 80-millisecond slots. And then he describes that there
1 is a period of repetition, and that would be the frame.
2 And those are assigned slots.
3      And then he discusses that there's hash
4 functions that are used on the paging channel for a
5 specific slot that the mobile and the base station are
6 to use. The mobile is to monitor.
7      So you can see -- and that is almost the exact
8 language out of the IS-95-A specification.
9      Q. And so did you find that the Tiedemann
10 document itself described TDM techniques under the
11 Court's construction?
12      A. Yes.
```

---

[1] Mr. Lanning did not offer any testimony that the "TDM techniques" element was obvious in light of Tiedemann.   To support the verdict, Tiedemann must therefore disclose "TDM techniques" explicitly or inherently.

Ex. E, Trial Transcript 44:14–45:12 (July 12, 2013 Morning Session).   Here, Mr. Lanning

referred to the only portion of Tiedemann to discuss the paging channel in any detail.  It states, in

its entirety:

> A single CDMA frequency can support up to 7 Paging Channels, operating at
> either 4800 bps or 9600 bps, for communications from the base station to the
> mobile station.   Paging Channels can also be included on different CDMA
> frequencies.   The Paging Channel is divided into slots of 80 ms duration.   A
> mobile station need only listen for pages in its assigned slots.   The base station
> can indicate that it has no more messages for mobile stations operating in the
> slotted mode, thus allowing these mobile stations, typically portables, to power
> down early in the slot further increasing battery life.   For a mobile staton, the
> period of slot repetition, called the slot cycle, is $0.08 \times 2^{N+4}$ seconds where N is
> from 0 though 7.   The mobile station can select the period of its assigned slots by
> registering with the value of N that it is using.   The mobile station uses a series of
> three hash functions to select the CDMA frequency to use, the Paging Channel on
> the frequency, and the slot in its specified slot cycle to monitor.   Similarly, the
> base station performs the hashing to determine the frequency, Paging Channel,
> and slot in which to send a page.

Ex. A, Tiedemann, DX-124 at DEFS0011381–82.   While Tiedemann explains that

communication between the base station and mobile stations occurs in "assigned slots," no part

of Tiedemann or of Mr. Lanning's above-cited testimony explains how those slots are assigned

"based on one or more characteristics associated with the data item."

The only statement in the record possibly relating to how Tiedemann might allocate time

slots to data items is Mr. Lanning's statement later in his testimony that Tiedemann "has one or

more characteristics associated with the data item, which would be the actual identification of the

cell phone."   Ex. E, Trial Transcript 49:25–50:2 (July 12, 2013 Morning Session).   But this

statement has no evidentiary support from Tiedemann.   Neither the portion of Tiedemann quoted

above nor any other portion of Tiedemann explains the allocation of slots in the paging channel

based on device identification—which, furthermore, is not a "characteristic associated with the

data item," as discussed in detail below—or anything else.   Instead, Mr. Lanning appears to have

improperly incorporated disclosures from other prior art, in particular the IS-95-A standard (*see*

Trial Exhibit DX-149, relevant portions attached as Exhibit D), into his testimony about Tiedemann.  Indeed, Mr. Lanning purposefully suggested to the jury that the specific disclosure lacking in Tiedemann was explained by his earlier testimony regarding IS-95-A.  *See* Ex. E, Trial Transcript 44:18–20 (July 12, 2013 Morning Session) ("And if this looks similar, this is very similar to the language that I showed you for the IS-95-A specification."); *id.* at 45:7–8 ("So you can see -- and that is almost the exact language out of the IS-95-A specification.").

But Defendants did not argue that IS-95-A was incorporated by reference in Tiedemann, and in fact they assured the Court that "Mr. Lanning will be testifying that the Tiedemann reference itself, within the four corners of the document, anticipates the claims of the asserted patents . . . [w]ithout having to rely on the incorporated reference." *Id.* at 7:3–10.  The text within the four corners of Tiedemann fails to disclose how time slots are assigned in the paging channel, and no disclosure from IS-95-A can fill that gap for purposes of anticipation.[2]

Because no portion of Tiedemann or Mr. Lanning's testimony discloses how the time slots are assigned in the paging channel, no reasonable jury could have found that Tiedemann allocates slots "based on one or more characteristics associated with the data item."  Therefore, no reasonable jury could have found that Tiedemann anticipates claims 2 and 5 of the '326 patent and claims 2 and 5 of the '211 patent, or that Tiedemann as a single reference renders obvious claim 9 of the '326 patent and claim 11 of the '819 patent.

---

[2] Furthermore, Defendants cannot reasonably argue that the jury could have found the asserted claims obvious based on the combination of Tiedemann with IS-95-A, as Mr. Lanning at no point in his testimony offered any opinion regarding the combination of these two references.  As explained during a sidebar conference with the Court, the IS-95 standard mentioned in Tiedemann and the IS-95-A standard discussed during the trial are different standards, with IS-95 coming out a year-and-a-half before Tiedemann was published and IS-95-A coming out a year after Tiedemann.  *See* Ex. E, Trial Transcript 8:1–9 (July 12, 2013 Morning Session).  Therefore, no reasonable jury could have found the asserted claims obvious in light of Tiedemann and IS-95-A because there was no evidentiary basis presented for such a combination.

**C.     The Court Should Grant a New Trial on Invalidity Because the Overwhelming Weight of the Evidence Showed That Characteristics of the User, Such as User or Device Identification, Cannot Satisfy the Requirement of "TDM Techniques" to Use "Characteristics Associated with the Data Item."**

If the Court does not grant Wi-LAN's renewed motion for judgment as a matter of law of no invalidity, the Court should grant Wi-LAN a new trial on the issue of invalidity for the reasons discussed above.  The jury verdict that the asserted claims are invalid as anticipated and/or obvious was against the weight of the evidence because (1) Mr. Lanning's testimony as to why or how a person of ordinary skill in the art would have been motivated to combine the prior art references in the manner of the claimed invention was insufficient as a matter of law, and (2) there was no evidence whatsoever that Tiedemann disclosed "TDM techniques"—in particular, allocation of time slots "based on one or more characteristics associated with the data item."  In addition, the Court should grant Wi-LAN a new trial on invalidity because the overwhelming weight of the evidence showed that characteristics of the user, such as the user or device identification, cannot satisfy the requirement that "TDM techniques" allocate time slots "based on one or more characteristics associated with the data."

Besides Tiedemann, Mr. Lanning testified that two other prior art references disclosed "TDM techniques": the IS-95-A standard and Gitlin.  Mr. Lanning's testimony for the "TDM techniques" element in the IS-95-A standard and Gitlin relied on characteristics of the user, rather than "characteristics associated with the data item."  For example, for IS-95-A, Mr. Lanning testified that "the one or more characteristics of the data item is the phone's identity" which is based on the "equipment serial number."  Ex. E, Trial Transcript 37:15–16, 38:9–14 (July 12, 2013 Morning Session).  With Gitlin, Mr. Lanning testified that "the characteristics of data have to do with whether you have high-speed users, medium-speed users, or low-speed

users, and also the user ID." *Id.* at 67:13–15.  However, this information all relates to the user, not the data being transmitted.

An inventor on the asserted patents, Mr. Paul Struhsaker, provided uncontradicted testimony that the distinction between allocating time slots based on the data rather than the user was a key part of the claimed invention.  Mr. Struhsaker explained that "the idea was we would look at the data and what was going on in the system, and we would schedule those based on what was happening."  Trial Transcript 125:6–8 (July 8, 2013 Morning Session) (cited portions attached as Exhibit H).  Indeed, Mr. Struhsaker testified in detail that a system that allocated time slots based on something as simple as user identification or other characteristics dependent on the user, rather than based on characteristics associated with the data, could not offer the benefits and flexibility of the invention, because consideration of different types of data and different requirements of the data would be lost.  *See id.* at 126:14–24; *id.* at 130:1–133:5.  He explained:

```
14      The idea behind this whole thing was a degree
15 of flexibility, because there were many types of data.
16 And in some cases, our customers might be doing two
17 phone calls, sending a fax, because they had a third
18 line, and running two or three computers. And they may
19 add another computer.
20      So it really was never based on what the
21 customer actually had as a quality of service or
22 business service level. That's something different.
```

*Id.* at 126:14–22.  When asked specifically why his invention "did . . . not base [allocation of bandwidth] on the characteristics of the user," Mr. Struhsaker explained:

```
17      The issue ending up being is that you can't
18 just say what the user is doing. The user may be doing
19 many things. So it's the many things; it's the many
20 activities that are important. It's not that it's Joe.
21 Joe just doesn't do one thing. Joe may be doing
22 multiple things, and Joe may be doing nothing.
23      It's really important to be able to look at
24 just what the services Joe needs and divide that up.
```

15

*Id.* at 132:4–5, 17–24.

Dr. Wells explained that prior art such as IS-95-A and Gitlin failed to allocate time slots based on "characteristics associated with the data item." For example, Dr. Wells explained that IS-95-A "doesn't look at the data that it's about to send and make -- and say this is a particular type of data. It actually just looks at which unit this mobile is actually going to be sent to, and it sends it to that." Trial Transcript 13:1–5 (July 12, 2013 Afternoon Session) (cited portions attached as Exhibit I). Dr. Wells explained that the "mobile identification number," or "MIN," used by IS-95-A to assign slots in the paging channel is "associated with the user. . . . It has nothing to do with the data that's being scheduled." *Id.* at 13:14–17. Likewise, for Gitlin, Dr. Wells testified that the time slots are assigned based on the user's level of service—i.e., a high-speed user, a medium-speed user, or a low-speed user—rather than based on a characteristic of a particular data item. *See id.* at 29:6–30:5. In Gitlin, "it doesn't matter, for example, whether this is a piece of voice traffic, whether it's a piece of text message, whether it's a website. That's not taken into account. It's the characteristics of the user within Gitlin." *Id.* at 29:21–25. Thus, Gitlin's disclosure, like that of IS-95-A, is directly contrary to the Court's construction of "TDM techniques" and also inventor Mr. Struhsaker's testimony.

The weight of the evidence presented at trial, therefore, was that characteristics of the user cannot satisfy the Court's requirement of "characteristics associated with the data item." Hence, Defendants failed to satisfy their burden to show invalidity by clear and convincing evidence. The weight of the evidence is against a finding of invalidity, and a new trial on the issue of invalidity is thus warranted.

## IV.    CONCLUSION

For the reasons set forth above, Wi-LAN respectfully requests that this Court set aside the jury verdict that the asserted claims of the '326, '819, and '211 patents are invalid and enter

judgment as a matter of law that these asserted claims are not invalid.  Alternatively, Wi-LAN

requests that this Court grant Wi-LAN's motion for a new trial on the issue of invalidity.

Dated:  August 13, 2013                           Respectfully submitted,

By:   /s/David B. Weaver
      David B. Weaver (TX Bar 00798576)
      Lead Attorney
      Avelyn M. Ross (TX Bar 24027817)
      Ajeet P. Pai (TX Bar 24060376)
      Syed K. Fareed (TX Bar 24065216)
      Jeffrey T. Han (TX Bar 24069870)
      Seth A. Lindner (TX Bar 24078862)
      VINSON & ELKINS LLP
      2801 Via Fortuna, Suite 100
      Austin, TX 78746
      Tel:  (512) 542-8400
      Fax: (512) 236-3476
      dweaver@velaw.com
      aross@velaw.com
      apai@velaw.com
      sfareed@velaw.com
      jhan@velaw.com
      slindner@velaw.com

      Steve R. Borgman (TX Bar 02670300)
      Gwendolyn Johnson Samora
      (TX Bar 00784899)
      VINSON & ELKINS LLP
      1001 Fannin Street, Suite 2500
      Houston, TX 77002-6760
      Tel: (713) 758-2222
      Fax: (713) 758-2346
      sborgman@velaw.com
      gsamora@velaw.com

      **Local Counsel**
      Johnny Ward (TX Bar No. 00794818)
      Wesley Hill (TX Bar No. 24032294)
      Claire Abernathy Henry
      (TX Bar No. 24053063)
      Ward & Smith Law Firm

P.O. Box 1231
1127 Judson Rd., Ste. 220
Longview, TX 75606-1231
Tel:  (903) 757-6400
Fax: (903) 757-2323
jw@jwfirm.com
wh@jwfirm.com
claire@wsfirmcom
***Attorneys for Plaintiff Wi-LAN Inc.***

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service on this the 13th day of August, 2013.

*/s/David B. Weaver*
David B. Weaver

18