**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| WI-LAN INC., | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 6:10–CV–521–LED |
| ALCATEL–LUCENT USA INC., *et al*., | |
| Defendants. | |

| | |
|---|---|
| WI-LAN INC., | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 6:13–CV–252–LED |
| HTC CORPORATION, *et al*., | |
| Defendants. | |

**RESPONSE TO WI-LAN INC.'S RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW OF NO INVALIDITY OR,
ALTERNATIVELY, MOTION FOR NEW TRIAL ON INVALIDITY**

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The jury reasonably found that Tiedemann, alone,
       invalidates the claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       1.  The only issue raised in Wi-LAN's Motion is whether
          Defendants presented evidence that Tiedemann
          discloses "TDM techniques." . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       2.  The jury heard evidence that: (1) the Tiedemann system
          allocates time slots to data items based on user identity;
          and (2) user identity is a characteristic associated with
          the data items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       3.  The jury's verdict was reasonable in light of the
          evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          a.  The jury reasonably found Mr. Lanning more
             credible than Dr. Wells. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          b.  Dr. Wells disregarded the Court's claim-
             construction ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  The jury reasonably found the claims invalid as obvious
       in light of the combination of Tiedemann and Gitlin. . . . . . . . . . . . . . . 8

       1.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       2.  Applying the proper standard, the facts adduced at trial
          support the jury's verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          a.  The jury heard uncontested testimony that there
             was a design need and market pressure to solve
             the "limited bandwidth problem." . . . . . . . . . . . . . . . . . . . 11

          b.  The jury heard uncontested testimony that there
             was a finite number of identified, predictable
             solutions to the limited bandwidth problem. . . . . . . . . . . . . . 12

          c.  The jury's obviousness verdict was reasonable
             in light of the uncontested evidence. . . . . . . . . . . . . . . . . . 13

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

*Anderson's–Black Rock, Inc. v. Pavement Salvage Co.,*
    396 U.S. 57 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.,*
    555 F.3d 984 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Elmer Corp. v. Computervision Corp.,*
    732 F.2d 888 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ericsson Inc. v. D-Link, Sys., Inc.,*
    No. 6:10-cv-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013). . . . . . . . . . . . . . 7, 8

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14, 15

*Leapfrog Enters., Inc. v. Fisher–Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stratoflex, Inc. v. Aeroquip Corp.,*
    713 F.2d 1530 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Streber v. Hunter,*
    221 F.3d 701 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sundance, Inc. v. DeMonte Fabricating, Ltd.,*
    550 F.3d 1356 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Wyers v. Master Lock Co.,*
    616 F.3d 1231 (Fed. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**PRELIMINARY STATEMENT**

The jury returned an invalidity verdict, based on the only credible evidence presented at trial on the issue, and it applied the proper legal standards in doing so. In moving for JMOL or, in the alternative, a new trial, Wi-LAN is asking the Court to ignore that evidence and apply improper standards. The Court should refuse to do so. Rather, because there was substantial evidence to support the verdict and the verdict was not against the great weight of the evidence, the Court should deny Wi-LAN's Renewed Motion for Judgment as a Matter of Law of No Invalidity or, Alternatively, Motion for New Trial on Invalidity (the "Motion") and let the verdict stand.

**BACKGROUND**

The patents at issue in this suit involve claims related to wireless telecommunications systems. Among other things, they describe systems and methods for increasing the number of users who are able to transmit and receive data within a single frequency channel. Specifically, the claims explain that a frequency channel can be subdivided using combinations of code division multiple access (CDMA) and time division multiplexing (TDM), thus allowing more users to communicate within the same frequency channel.

Wi-LAN claimed Defendants' products that comply with specifications in the 3GPP telecommunications standard governing HSDPA (high-speed downlink packet access) infringe. Defendants showed that their products do not infringe and that the patents are invalid. After deliberating for less than hour, the jury returned a verdict for Defendants on all grounds, finding no infringement and that the patents were invalid as both anticipated and obvious.

**ARGUMENTS**

**A.  The jury reasonably found that Tiedemann, alone, invalidates the claims.**

    **1.  The only issue raised in Wi-LAN's Motion is whether Defendants presented evidence that Tiedemann discloses "TDM techniques."**

Defendants' expert on invalidity, Mark Lanning, testified that a publication titled "CDMA for Cellular and PCS" ("Tiedemann" (DX 124)) anticipated or rendered obvious every element of the claims at issue. As Mr. Lanning explained, Tiedemann is a paper that was presented at a telecommunications conference in Boston in 1994.[1] Wi-LAN's Motion does not dispute that Tiedemann is prior art. Nor does it dispute the majority of Mr. Lanning's conclusions regarding Tiedemann. Wi-LAN's argument focuses on a single issue, namely, whether the jury reasonably found Tiedemann discloses one of the claim limitations—"TDM techniques."

The claims at issue all require, among other things, a means for either encoding data items using TDM techniques or decoding data items that have been encoded with TDM techniques.[2] As construed by the Court, TDM techniques are "techniques for allocating an interval of time within a predetermined frame period to a data item, based on one or more characteristics associated with the data item." *Memorandum Opinion and Order* (May 16, 2012), ECF No. 200, at 11). There is no dispute that the Tiedemann system allocates an interval of time within a predetermined frame period to a data item. The only question raised by Wi-LAN's Motion is whether it does so "based on one or more characteristics associated with the data item," as required by the Court's construction. The evidence at trial clearly demonstrates that it does.

---

    [1]  *See* **Ex. E:** Trial Tr. 43:10–24 (July 12, 2013, Morning Session).
    [2]  *See, e.g.*, **Ex. L:** '326 Patent (PX 1) at 28:39–45.

**2. The jury heard evidence that: (1) the Tiedemann system allocates time slots to data items based on user identity; and (2) user identity is a characteristic associated with the data items.**

Mr. Lanning showed the jury a page from Tiedemann describing the paging channel in the Tiedemann system, which he testified discloses TDM techniques under the Court's construction.[3]



As Mr. Lanning explained:

> Mr. Tiedemann is describing the paging channel . . . . It's divided into slots of 80 milliseconds' duration. And then he describes that there is a period of repetition, and that would be the frame. And those are assigned slots. And then he discusses that there's hash functions that are used on the paging channel for a specific slot that the mobile and the base station are to use. The mobile is to monitor.[4]

Mr. Lanning then clarified that this description of the paging channel discloses TDM techniques:

> Q. And so **did you find that the Tiedemann document itself described TDM techniques under the Court's construction?**
>
> A. **Yes**. . . .
>
> Q. And did you find a TDM encoder arranged to apply time division multiplexing techniques in the Tiedemann reference?

---

[3]   **Ex. H:** DX 124 at 285 (DDX 13-19); **Ex. E:**Trial Tr. 44:14–45:8 (July 12, 2013 (Morning Session)); *id.* at 49:18–50:4.

[4]   *Id.* at 44:21-45:6.

A.  Yes. As I explained earlier, this slide shows that this is the TDM techniques that they're explaining here; that it has all three components. It has—it has the interval of time; it has the predetermined frame; and **it has one or more characteristics associated with the data item, which would be the actual identification of the cell phone.**[5]

Significantly, Wi-LAN did not offer any evidence or testimony to counter Mr. Lanning's assertion that the Tiedemann system used the mobile device's identity to allocate time intervals to data items. Wi-LAN's sole argument at trial was that the identity of the mobile device is not a characteristic associated with the data. Indeed, Wi-LAN's expert, Dr. Jonathan Wells, acknowledged that his only "beef" with Mr. Lanning's opinion was that "although the slots are allocated based on the user's identity, the user's identity is not a characteristic associated with the data item."[6] Dr. Wells agreed, however, that the user is associated with the data being sent to his or her mobile device and that time intervals are allocated to that data based on the identity of the user:

Q.  **A user is associated with its data, the data that's being transmitted to that user. You'll agree with that?**

A.  **Generally, yes, it would be associated with it**. . . .

Q.  And . . . th[e] encoder that's inserting the data for those mobiles into the paging channel has to know the identity of that user to do that, right?

A.  It has to know it, but it doesn't—it doesn't look at the characteristics of that data item.

Q.  It's looking at the user identity, though, right?

A.  It knows—it has to know which end-user to send the data to.

Q.  Okay. And **using that mobile identity, this paging channel allocates those slots in a pre-defined repeated sequence. You'll agree with that, right?**

---

[5]  *Id.* at 45:9–12, 49:18–50:2 (emphasis added).
[6]  **Ex. F:** Trial Tr. at 42:14–19 (July 12, 2013 (Afternoon Session)).

A. **That's right, yes.**[7]

Nevertheless, Dr. Wells insisted that the user's identity is <u>not</u> a characteristic of the data and that "allocation based on the user in a pre-defined repeated sequence, is excluded by the Court's construction."[8]

The ultimate question, therefore, is whether Dr. Wells's completely unsupported assertion that user identity is not a characteristic of the data item somehow rendered Mr. Lanning's testimony insufficient to support the verdict. As explained below, the answer is clear—the verdict should stand.

**3.   The jury's verdict was reasonable in light of the evidence.**

**a.   The jury reasonably found Mr. Lanning more credible than Dr. Wells.**

This case presents a classic "battle of the experts." Mr. Lanning testified that the identity of the mobile device is a characteristic associated with the data item. Dr. Wells testified that he disagreed with Mr. Lanning on this factual issue:

> Q. So you and Mr. Lanning disagree about whether the MIN [Mobile Identification Number] is a characteristic of the data item or a characteristic associated with the user?
>
> A. It would appear that way. In my opinion, this MIN is not a characteristic associated with the data item as is required by the Court's construction of TDM techniques.[9]

Because there was conflicting expert testimony, the jury was free to "make credibility determinations and believe the witness it consider[ed] more trustworthy." *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (quotations omitted); *see also Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984) (the court may not "substitute its choice for that of the jury between conflicting elements of the evidence"); *DDR Holdings, LLC*

---

[7]   *Id.* at 42:24–43:21 (emphasis added).
[8]   *Id.* at 42:22–25.
[9]   *Id.* at 14:3–9.

*v. Hotels.com, L.P.*, — F. Supp. 2d — , 2013 WL 3187161, at *11 (E.D. Tex. June 20, 2013)

("When opposing experts differ on how a claim limitation is met, as is the case here, it is up to

the jury to decide which opinion is more credible in light of the evidence."). In fact, this is the

position Wi-LAN took on this exact issue in the months leading up to trial, before the jury found

in Defendants' favor:

> THE COURT:   So, in other words, you are saying that the dispute is
> whether a user identity constitutes characteristics associated with a data
> item?
>
> MR. BORGMAN:  I think that is exactly right, Your Honor.
>
> THE COURT:  You are saying that is a factual dispute —
>
> MR. BORGMAN:  Yes.
>
> THE COURT:  — for the jury to determine based on the experts?
>
> MR. BORGMAN:  Correct, Your Honor.[10]

The jury was certainly reasonable in finding Mr. Lanning more credible than Dr. Wells. Dr.

Wells, after all, testified that a spreading tree is not a spreading tree[11]; that an overlay encoder

does not encode data using overlay codes[12]; that he did not know how telephone numbers

---

[10]   Hearing Tr. at 20:25–21:10 (Feb. 26, 2013) (emphasis added).

[11]   *Id.* at 63:3–15: ("Q. And if we turn, we see that the figure that's being referred to is the
figure I showed you before, Figure 4-3, a tree, right? A. I don't know. I mean, it's not a
spreading tree, because it—the Tiedemann reference talks about merging these channels
together. This makes no sense. Q. It's not a spreading tree? It says spreading right at the top of
the tree. A. It doesn't say spreading tree; it says spreading. Q. It says spreading right at the top of
the tree, right? A. I see that it says spreading, yes.").

[12]   *Id.* at 56:17–57:1: ("Q. Okay. And then if we look at Figure 4-3—you didn't show us this
figure on direct, did you? A. No, I didn't, because this—the—Tiedemann here talks about this
overlay code generator as merging codes together. This—this figure makes no sense in the
context of this patent—of this paper. Q. It says: Overlay Encoding, is the title of this figure,
right? A. Yes. And as I said, just because it says overlay encoding, doesn't mean it's an overlay
encoder.").

work[13]; and that the channel quality indicator (CQI) in the accused products does not measure inter-cell interference because "you don't have many elevators out in a rural [area]."[14] Because the determination of which expert's opinion was more credible was an issue for the jury, under these facts there is no reason to reopen the jury's factual determination, and the Court should deny Wi-LAN's motion. *See Ericsson Inc. v. D-Link, Sys., Inc.*, No. 6:10-cv-473, 2013 WL 4046225, at *17 (E.D. Tex. Aug. 6, 2013).

### b. Dr. Wells disregarded the Court's claim-construction ruling.

As noted above, Dr. Wells did not dispute that the Tiedemann system allocates intervals of time to data items based on the user in a pre-defined repeated sequence. Rather, he argued that "allocation based on the user in a pre-defined repeated sequence is excluded by the Court's construction [of "TDM techniques]."[15] Dr. Wells is wrong.

The Court construed "TDM techniques" to mean "techniques for allocating an interval of time within a predetermined frame period to a data item, based on one or more characteristics associated with the data item." *Memorandum Opinion and Order* (May 16, 2012), ECF No. 200, at 11. The Court later clarified this construction in its ruling on Defendants Motion for Clarification of the Construction of a Single Term in the Court's Claim-Construction Order. Order (Mar. 5, 2013), ECF No. 341. There the Court ruled that "its construction of TDM techniques cannot be interpreted to exclude characteristics described in the specification." *Id.* at 3.

---

[13]   **Ex. C:** Trial Tr. 129:13–23 (July 9, 2013 (Morning Session)) ("Q. The area code . . . that's the area right, 903. Right, okay? And, in fact, if you were to look up how phone numbers work, right, the next three digits tell you a particular switch in that area, right? A. I—I really don't know.").

[14]   *Id.* at 146:6–14.

[15]   **Ex. F:** Trial Tr. at 43:22–25 (July 12, 2013 (Afternoon Session)).

Dr. Wells apparently ignored the Court's clarification because the specification, which is shared in pertinent part by all of the patents-in-suit, discloses allocating time intervals in a predefined sequence based on the user. In fact, the Court has already found that "the specification discloses in Figure 9B the use of predefined repeated sequences as a TDM technique." *Id.* And the Summary of the Invention discloses allocating time slots to data items in a predefined sequence based on the particular subscriber terminals associated with the data items.[16] Thus, since the Court held that its construction cannot exclude TDM techniques described in the specification, and since there is no dispute that Tiedemann discloses allocating intervals of time to data items based on the user in a pre-defined repeated sequence, Tiedemann discloses TDM techniques, as that term was construed by the Court.[17]

The Court should therefore deny Wi-LAN's motion for this reason as well.

**B.  The jury reasonably found the claims invalid as obvious in light of the combination of Tiedemann and Gitlin.**

The claims at issue are also invalid as obvious in light of the combination of Tiedemann and U.S. Patent No. 6,018,528 ("Gitlin"; DX 148). Like Tiedemann, Gitlin describes a wireless telecommunications system that combines CDMA with TDM.[18] Mr. Lanning testified that Gitlin discloses every element of the claims at issue except overlay codes.[19] Wi-LAN's motion does not dispute this testimony or argue that it was insufficient in any way. In particular, Wi-LAN's Motion does not dispute Mr. Lanning's conclusion that Gitlin discloses TDM techniques.

---

[16]  *See* **Ex. L:** '326 Patent (PX 1) at 3:63–4:12; *see also id.* at 13:38–49.

[17]  Wi-LAN is effectively seeking a belated claim-construction ruling that would narrow the scope of the term TDM techniques. Not only is there no basis for such a ruling, having failed to seek a new construction before the verdict, Wi-LAN also waived its arguments regarding this limitation.

[18]  *See* **Ex. E:** Trial Tr. at 66:1–8 (July 12, 2013 (Morning Session)).

[19]  *See id.* at 66:11–70:23.

In fact, Mr. Lanning's testimony was quite clear on this point—Gitlin allocates time slots to data based, in part, on the type of data begin transmitted:

> Q.  And did you find TDM techniques as construed by the Court?
>
> A.  Yes.
>
> Q.  Could you explain that?
>
> A.  You have TDM techniques. So there's a frame. So we need three pieces, right? We need a—we need this slot, or we need the increment of time. And we see all kinds of different slots. This would be the slots (indicating) that are shown from S0 to S6. And then the frame period would be from S0 through S6. That's the frame period. And **the third thing we need for that construction—for the Court's construction for TDM techniques is a characteristic of the data. Well, if you look down at the bottom of Gitlin, you'll see that the characteristics of data have to do with whether you have high-speed users, medium-speed users, or low-speed users, and also the user ID.** So there's two different characteristics associated with the data item.
>
> Q.  And why would the users need different speeds?
>
> A.  Users have different speeds, want to pay different amounts, or they may only want to send a fax part of the time, and then want lower speed for voice calls or lower speed data connections at other times.[20]

Dr. Wells agreed that Gitlin discloses allocating data items, in part, based on the type of data being transmitted.

> Q.  And then if we go down in the same paragraph [in Gitlin[21]], it talks about a system in which the individual time slots can transmit a given number of bits for voice, 'n' bits, or video, 'm' bits, transmissions using different amounts of medium bandwidth. Do you see that?
>
> A.  Yes, I do.
>
> Q.  Voice is a type of data, right?
>
> A.  Yes.
>
> Q.  And video is a type of data, right?

---

[20]  *Id.* at 66:23–67:22; *see* **Ex. K:** Gitlin (DX 148) Fig. 7 (**Ex. I:** DDX 13–31).

[21]  *See* **Ex. K:** Gitlin (DX 148) at 2:22–25.

> A.  It can be, yes.
>
> Q.  And here we see 'n' bits are given to voice, 'm' bits are given to video, different amounts of bits given to different types of data, right?
>
> A.  I see that written down here.[22]

No doubt in view of this testimony, Wi-LAN is not disputing that the jury reasonably found that: (1) Gitlin and Tiedemann are prior art; (2) Gitlin disclosed a wireless telecommunications system that included TDM techniques; and (3) Tiedemann disclosed every other element of the claims at issue. So the question is not whether the claim elements were found in the prior art, but rather whether it would have been obvious to combine Gitlin with Tiedemann. Wi-LAN contends that Mr. Lanning's testimony does not support a finding of obviousness because he allegedly did not explain why a person of ordinary skill in the art would have combined the TDM techniques disclosed in Gitlin with the remaining claim elements disclosed in Tiedemann. As explained below, Wi-LAN is incorrect.

## 1.  Legal Standard

Wi-LAN asks the Court to apply an improper and overly rigid approach to the obviousness analysis. In *KSR*, the Supreme Court "instruct[ed] courts to take a more 'expansive and flexible approach' in determining whether a patented invention was obvious at the time it was made." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007)). The Court emphasized that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation." *KSR*, 550 U.S. at 419. Indeed, expert testimony concerning motivation to combine may even be unnecessary: "*KSR* and our later cases establish that the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert

---

[22]   **Ex. F:** Trial Tr. at 53:3–17 (July 12, 2013 (Afternoon Session)).

testimony." *Wyers*, 616 F.3d at 1239. This is particularly true in cases, like this one, where the evidence establishes that there was a design need or market pressure to solve a problem and a finite number of solutions:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. 421; *see also Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 991 (Fed. Cir. 2009) (holding that where all of the limitations of the patent were present in the prior art, and the invention was addressed to a known problem, "*KSR* . . . compels the grant of summary judgment of obviousness").[23]

### 2.  Applying the proper standard, the facts adduced at trial support the jury's verdict.

#### a.  The jury heard uncontested testimony that there was a design need and market pressure to solve the "limited bandwidth problem."

The jury heard testimony throughout the trial that limited bandwidth was a problem for engineers in the wireless telecommunications industry at the time of the invention of the patents-in-suit. Specifically, the challenge was to create systems that allowed more and more cellular subscribers to communicate along the same radio frequencies at the same time. The following are some examples of the testimony.

- Dr. Wells: "[O]ne of the problems that we have in the cellular industry is this limited bandwidth problem. Basically what happens, when you make that call from your cell phone up to a cell tower, the traffic is carried on a radio wave, and that has a particular frequency, and there's only a certain number of those frequencies that are really available. So what happens is . . . those frequencies are very jealously guarded,

---

[23]  The Court instructed the jury on this standard in its charge, further explaining: "you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention as a whole, before the time of the claimed invention, <u>although proof of this is not a requirement to prove obviousness</u>." **Ex. G:** Trial Tr. at 35:19–23 (July 15, 2013 (Morning Session)) (emphasis added); *see also id.* at 35:24–37:7. Wi-LAN did not object to this portion of the charge.

and it's limited the number that you can use. And what that does is that places a limit on how many cell phones can actually be used within a cell. So we call that the limited bandwidth problem."[24]

- Dr. Wicker: "[The] problem is that as more subscribers subscribe, we need more channels. We need to be able to support more people. But we've got this situation in which we're stuck. We've got 16 subscribers already and 16 channels. So we have to have some way of expanding our system so that it covers more people."[25]

- Paul Struhsaker: ""[W]ireless is—is an expensive commodity, So you have to use it very, very carefully. The government charges billions of dollars for the use of Spectrum. . . . We were solving a real problem that real people had in the roll-out in 1995. . . . [A]t the time maybe 25 percent of the United States had a cell phone, and they had a big issue with voice capacity."[26]

### b. The jury heard uncontested testimony that there was a finite number of identified, predictable solutions to the limited bandwidth problem.

The jury also heard abundant and undisputed testimony that, at the time of the invention, there was a finite number of identified and predictable ways of addressing the so-called limited-bandwidth problem. These included dividing frequency channels using CDMA, TDM, combinations of CDMA and TDM, and combinations of CDMA and overlay codes. The following are examples of some of that testimony.

### CDMA

- Dr. Wells: "Q. Were there other approaches that were used to try and solve this bandwidth problem? A. Yes. The other one, of course, is code division multiple access, CDMA."[27]

- Dr. Wicker: Q. "[W]hat are some of the techniques that have been used to allow these multiple transmissions to occur on the network? A. Well, there's two . . . . The first is code division multiple access."[28]

---

[24] **Ex. B:** Trial Tr. 49:14–50:2 (July 8, 2013 (Afternoon Session)).

[25] **Ex. D:** Trial Tr. at 187:22–188:3 (July 10, 2013 (Afternoon Session)).

[26] **Ex. A:** Trial Tr. 118:24–119:9 and 123:12–14 (July 8, 2013 (Morning Session)) (emphasis added).

[27] **Ex. B:** Trial Tr. 51:12–15 (July 8, 2013 (Afternoon Session)).

[28] **Ex. D:** Trial Tr. 183:3–8 (July 10, 2013 (Afternoon Session)).

<u>TDM</u>

- <u>Dr. Wells</u>: "Q. And so how do cell systems deal with this limited bandwidth problem if everybody wants to use all of these different types of data" A. Well, there's various ways. The first way is time division multiple access."[29]

- <u>Dr. Wicker</u>: "Q. Now, another technology we've heard about in this case is time division multiplexing. A. That's right. Q. What is that? A. That's the equivalent of taking turns talking. . . . So what we see here is a number of slots that have been allocated to different users."[30]

<u>Combination of CDMA and TDM</u>

- <u>Dr. Wells</u>: "Q. The industry knew and the engineers in the mobile communications knew to put TDMA and CDMA in the same system, right, before the Airspan patents? A. There was some examples of that, yes."[31]

<u>Combination of CDMA and Overlay Code</u>

- <u>Dr. Wells (by deposition)</u>: "Q. It's fair to say that the combination of orthogonal channels and overlay codes was known prior to the invention of the '326 patent and the other patents in his case, correct? A. That was known."[32]

   **c.  The jury's obviousness verdict was reasonable in light of the uncontested evidence.**

Mr. Lanning testified that both Tiedemann and Gitlin disclosed wireless telecommunication systems that offered solutions to the limited bandwidth problem.[33] He also testified that the solutions they offered included using known and predictable TDM and CDMA techniques.[34] Thus, he concluded that the combination of Tiedemann and Gitlin rendered the claims at issue obvious:

   Q.  Okay. And why would it have been obvious in your mind to combine Gitlin and Tiedemann?

---

[29]   **Ex. B:** Trial Tr. 50:3–7 (July 8, 2013 (Afternoon Session)).
[30]   **Ex. D:** Trial Tr. 183:20–184:3 (July 10, 2013 (Afternoon Session)).
[31]   **Ex. C:** Trial Tr. 86:9–12 (July 9, 2013 (Morning Session)).
[32]   *Id.* at 81:14–18.
[33]   *See* **Ex. E:** Trial Tr. 42:20–65:23 (Tiedemann) and 66:1–72:6 (Gitlin) (July 12, 2013 (Morning Session)).
[34]   *See id.*

> A. Because both of these patents are in regard to cellular systems, specifically, CDMA wireless systems. And Gitlin was from Bell Labs, AT&T Bell Labs. Tiedemann was from Qualcomm. And as you've heard, in the early 1990s, they were working together on CDMA solutions. So there's multiple reasons why one of ordinary skill in the art would combine Gitlin with Tiedemann.[35]

Following *KSR*, this is more than sufficient: "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421.

The Federal Circuit's ruling in *Sundance, Inc. v. DeMonte Fabricating, Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008), is instructive in this regard. In that case, the district court entered JMOL overturning a jury verdict of obviousness, based on a lack of motivation to combine the prior-art references at issue. *Id.* at 1365, 1366. On appeal, the Federal Circuit first held there was no admissible expert testimony regarding motivation to combine. *Id.* at 1364–65. Despite the lack of expert testimony, the Federal Circuit reversed the district court's JMOL and found the claims invalid as obvious because: (1) there was no dispute regarding the content of the prior art, the scope of the patent claims, or the level of ordinary skill in the art; and (2) the prior-art combination at issue "simply arrange[d] old elements with each performing the same function it had been known to perform and yield[ed] no more than one would expect from such an arrangement." *Id.* at 1365, 1367.

Applying the Federal Circuit's reasoning to this case, there is no basis for overturning the jury's obviousness verdict. As explained above, there is no dispute that Tiedemann and Gitlin, combined, disclose every element of the claims at issue; there is no dispute regarding the scope of those claims; and there is no dispute regarding the level of ordinary skill in the art. Further, as

---

[35]   *Id.* at 70:2–12.

in *Sundance*, combining Tiedemann with Gitlin simply arranged old elements—i.e., CDMA and TDM—with each performing the same function it had been known to perform—i.e., subdividing frequency channels—and yielding no more than one would expect from such an arrangement. The only relevant difference between this case and *Sundance* is that in this case the jury did hear admissible expert testimony regarding motivation to combine, thus making the jury's obviousness verdict even more reasonable.[36]

In sum, this is a textbook example of a case where the asserted claims describe a combination of familiar elements according to known methods that does no more than yield predictable results. *KSR,* 550 U.S. at 416. The Court should therefore deny Wi-LAN's motion and refuse to overturn the jury's obviousness verdict.

## CONCLUSION

For the reasons set forth above, the jury's verdict was supported by evidence. Indeed, the jury returned the <u>only</u> reasonable verdict based on the evidence. The Court should therefore deny Wi-LAN's Motion in its entirety.

---

[36] Wi-LAN also criticizes Mr. Lanning for failing to consider objective indicia of nonobviousness. But the alleged evidence of nonobviousness related to the widespread use of HSDPA, and the jury effectively found that the patents do not cover HSDPA when it found no infringement. Plainly put, if the patent claims do not cover HSDPA, the widespread use of HSDPA is not an indication of nonobviousness. Further, the evidence presented regarding companies who licensed the patents-in-suit similarly does not indicate nonobviousness, as there was no evidence presented of a nexus between the merits of the claimed inventions and such licenses. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983) (upholding a finding of obviousness where the patentee had "shown neither a nexus between the merits of the invention and the licenses of record, nor that those licenses arose out of recognition and acceptance of the patent."). Finally, secondary considerations of nonobviousness, even if Wi-LAN had raised any, would not overcome the strong evidence of obviousness in this case. *See Sundance*, 550 F.3d at 1368; *see also Anderson's–Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61 (1969) (considering argument of secondary considerations but holding that "those matters without invention will not make patentability"); *Leapfrog Enters., Inc. v. Fisher–Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (holding that the objective considerations of nonobviousness presented, including substantial evidence of commercial success, praise, and long-felt need, were inadequate to overcome a strong showing of primary considerations that rendered the claims at issue invalid).

Dated: August 30, 2013

Respectfully submitted,

By: */s/Robert A. Appleby*
Robert A. Appleby (pro hac vice)
Jeanne M. Heffernan (pro hac vice)
Akshay S. Deoras (pro hac vice)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
Alcatel-Lucent-Wi-LAN-
Defense@kirkland.com


Michael E. Jones
Allen F. Gardner
POTTER MINTON PC
110 N. College, Suite 500 (75702)
P.O. Box 359
Tyler, Texas 75710
(903) 597 8311
(903) 593 0846 (Facsimile)
mikejones@potterminton.com
allengardner@potterminton.com

By: */s/ Martin R. Bader*
Martin R. Bader (pro hac vice)
Daniel N. Yannuzzi (pro hac vice)
Lee Hsu (pro hac vice)
Graham M. Buccigross (pro hac vice)
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
Tel: (858) 720-8924
Fax: (858) 847-4892
LegalTm-WiLAN-Alcatel-
@sheppardmullin.com

Eric H. Findlay (TX Bar No. 00789886)
Brian Craft (TX Bar No. 04972020)
FINDLAY CRAFT
6760 Old Jacksonville Hwy, Suite 101
Tyler, TX 75703
Tel: (903) 534-1100
Fax: (903) 534-1137
efindlay@findlaycraft.com

bcraft@findlaycraft.com

ATTORNEYS FOR DEFENDANTS
HTC CORPORATION, HTC AMERICA,
INC.,
AND EXEDEA, INC.

By: _/s/ Bruce S. Sostek_
Bruce S. Sostek (Lead Attorney)
 State Bar No. 18855700
 Bruce.Sostek@tklaw.com
Richard L. Wynne, Jr.
 State Bar No. 24003214
 Richard.Wynne@tklaw.com

THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214.969.1700
214.969.1751 (facsimile)

ATTORNEYS FOR DEFENDANTS
TELEFONAKTIEBOLAGET LM ERICSSON,
ERICSSON INC., SONY MOBILE
COMMUNICATIONS AB, AND SONY MOBILE
COMMUNICATIONS (USA) INC.

**CERTIFICATE OF SERVICE**

This is to certify that on this 30th day of August, 2013, a copy of the foregoing document

was served on counsel of record for Plaintiff by electronic mail.

/s/ Richard L. Wynne, Jr.
Richard L. Wynne, Jr.